UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  08-22432-CIV-LENARD/GARBER

Erich Humberto LIMA Moreno,

Petitioner,

v.

Ereneidy GARCIA Martin,

Respondent.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on the Verified Petition for Return of Minor Child to the Kingdom of Spain ("Petition") [DE 1], which was referred to the undersigned Magistrate Judge by the Honorable Joan A. Lenard, United States District Judge.  For the reasons set forth below, it is respectfully recommended that the Court GRANT the Petition.

### I. Background

Erich Humberto Lima Moreno ("Petitioner" or "Mr. Lima") filed his Petition against Ereneidy Garcia Martin ("Respondent" or "Ms. Garcia") on September 3, 2008, pursuant to The Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980 ("Hague Convention" or "Convention"), T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed.Reg. 10494 (March 26, 1986), and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601-10.  Mr. Lima sought the prompt return to Spain of the parties' three-year-old daughter, Erika Lima Garcia ("Erika").  The heart of the parties' dispute is whether Petitioner consented to Erika's permanent relocation to Miami.

## II. The Hague Convention and ICARA

The Hague Convention, to which the United States and Spain are parties, has as its objectives: "(a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and (b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Convention, art. 1. The United States implemented the Convention through ICARA.

The underlying premise of the Convention is that a child's country of "habitual residence" is the place where questions of custody are best decided. *See Croll v. Croll*, 229 F.3d 133, 137 (2nd Cir. 2000) (citing Elisa Perez-Vera, Explanatory Report: Hague Conference on Private International Law, in 3 ACTS AND DOCUMENTS OF THE FOURTEENTH SESSION (CHILD ABDUCTION) 426, 434-35, ¶ 34 (1980)). The Convention's purpose is therefore to "restore the status quo and deter parents from crossing international borders in search of a more sympathetic court." *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 376 (8th Cir. 1995) (citations omitted). Under article three of the Convention and ICARA, a removal or retention is considered wrongful if

> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

In order to establish a prima facie case of wrongful removal or retention under the Convention and ICARA, a petitioner must show by a preponderance of the evidence that (1) the habitual residence of the child immediately before the date of the alleged wrongful removal was in the foreign country; (2) the removal breached the petitioner's custody rights under the foreign country's law; and (3) the petitioner was exercising custody rights at the time of the removal. *See*

*Lops v. Lops*, 140 F.3d 927, 936 (11th Cir. 1998) (citing 42 U.S.C. § 11603(e)(1)(A)); *Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1340 (S.D. Fla. 2002); *Pesin v. Osorio Rodriguez*, 77 F.Supp.2d 1277, 1284 (S.D. Fla. 1999), *aff'd*, 244 F.3d 1250, 1253 (11th Cir. 2001). Once the Petitioner meets that burden, ICARA requires a child who has been wrongfully removed or retained to be "promptly returned unless one of the narrow exceptions set forth in the Convention applies." *See Lops*, 140 F.3d at 936 (citing 42 U.S.C. § 11601(a)(4)). A court has discretion to order the return of a child even if a defense is established, if return of the child would further the aims of the Convention. Convention, art. 18; *see also In re Ahumada Cabrera*, 323 F. Supp. 2d 1303, 1310 (S.D. Fla. 2004) ("'a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention.'") (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)). A district court considering a Hague Convention petition cannot decide the underlying custody dispute, but has jurisdiction to decide only the merits of the wrongful removal claim.[1] *See Lops*, 140 F.3d at 936; *Bocquet*, 225 F. Supp. 2d at 1340.

### III. Facts and Procedural History

The Court finds the following facts based upon the evidence and testimony adduced at the Final Hearing. Mr. Lima and Ms. Garcia are the biological parents of Erika, who was born on Grand Canary Island, Spain, on September 3, 2005. Exhs. 1-4.[2] Mr. Lima is a citizen of Cuba and a permanent resident of Spain. Exhs. 31-32; tr. at 12:19-20. He applied for Spanish citizenship in early 2007, and his application is pending. Tr. at 12:19-20. Mr. Lima moved to Spain in 2001 with

---

[1] The Court explained several times during the final hearing that the issue of custody is not before the Court. *See, e.g.,* tr. at 147:3-13; 175:10-13. Consistent with the proper scope of this proceeding, the Court will not discuss any of the custody issues, or evidence bearing primarily on the custody issue.

[2] Because Respondent submitted no Exhibits, all references to Exhibits are to Petitioner's Exhibits. Where the original Exhibit is in Spanish, reference is to the English translation. The Court notes that Respondent requested no continuance of the Final Hearing for the purpose of obtaining evidence or for any other purpose.

an employment contract, tr. at 12:17-20; 55:5-7, and currently is employed as a construction site supervisor.  Ms. Garcia is a citizen of both Cuba and Spain, Exh. 28; tr. at 151:3-6, and resides in Hialeah, Florida.  Exh. 37.  Her employment, if any, is unclear from the record.

Mr. Lima and Ms. Garcia began cohabitating on Grand Canary Island, Spain, in late 2004 or early 2005, along with Ms. Garcia's daughter from a prior relationship.  The family continued to live together following Erika's birth until February 1, 2007.  On February 1, 2007, Mr. Lima and Ms. Garcia separated.  Tr. at 22:19-23; 28:16-18; 124:4-7; 129:3-4.  Ms. Garcia moved with Erika and her older daughter to Tenerife, a nearby island where relatives of Ms. Garcia, including her mother, a sister, a grandfather, and a brother live.

Mr. Lima and Ms. Garcia agree that on the day they separated, February 1, 2007, they executed a written property division agreement prepared by a Spanish public notary.[3]  Tr. at 23:2-5, 15-18; 127:25-128:9.  The agreement set forth the value of a jointly owned condominium and the then-outstanding mortgage on it.  Exh. 11 at 7-9.  It determined the equity value (the difference between the value of and the debt on the property) to be 24,000 Euros, and divided that sum equally between Mr. Lima and Ms. Garcia.  *Id.* at 9.  Mr. Lima paid Ms. Garcia her share, or 12,000 Euros.

The parties also agree that on February 1, 2007, Mr. Lima, at the request of Ms. Garcia, executed a Permission to Travel prepared by the same notary.  Exh. 13; tr. at 25:22-24; 127:25-128:9.  Mr. Lima and Ms. Garcia strongly disagree about what this document authorized.  Ms. Garcia claims

---

[3]  The Court takes judicial notice of the fact that "Notaries of 'civil law' nations have significantly different duties than their U.S. counterparts and fulfill many functions not permitted Notaries in the United States. Civil law Notaries are attorney-like legal professionals who act as impartial advisers, prepare documents on behalf of both sides in a transaction and ensure that these documents meet the legal requirements of the appropriate jurisdiction. … [A] document [prepared by a civil law notary] is considered self-proving - based on the status and reputation of the Notary drafting it, it is accepted as authentic and legally admissible in a court of law. "  David S. Thun, "Common Law & Civil Law Notaries: A World Of Difference," National Notary Association (2000) ("Common Law & Civil Law Notaries"), available at: http://www.nationalnotary.org/news/index.cfm?Text=newsNotary&newsID=42 (last visited October 4, 2008).

Mr. Lima "always knew" she intended to move permanently to the United States with Erika after the separation, and that the Permission to Travel is evidence of his agreement to the plan.  Mr. Lima claims he neither knew nor approved of the plan.  The Court will return to this dispute below.

In addition, Mr. Lima testified that on February 1, 2007, he and Ms. Garcia executed a third document, Exh. 12.  Tr. at 24:13-25.  That document purports to be a handwritten receipt of Mr. Lima's payment to Ms. Garcia of 2000 Euros for "the arrangements for and the expenses of obtaining housing" and 300 Euros to purchase household effects.  Although Ms. Garcia agrees she received 2,300 Euros for her personal property in the couple's apartment, and that the signature on Exhibit 12 is her signature, she denies having signed the document.  Tr. at 129:13-15; 131:2-15. This document is also discussed in more detail below.

The parties agree that they signed no agreement regarding custody of Erika and that no court had or has yet entered an order regarding custody.  The parties dispute whether Mr. Lima's Spanish attorney spoke with Ms. Garcia by telephone prior to her departure from Spain and informed her that Mr. Lima would be filing a custody proceeding there.  Mr. Lima and his attorney both testified that the attorney spoke by telephone with Ms. Garcia in February 2007, prior to her departure from Spain and advised Ms. Garcia of Mr. Lima's intention imminently to initiate custody proceedings in the Spanish court.  Exh. 15; tr. at 32:21-33:17; 170:8-173:7.  Ms. Garcia denied ever having spoken with the attorney.  Tr. at 137:13-138:21.

The parties sharply dispute the events between February 1, their separation, and February 21, when Ms. Garcia left Spain with Erika, but they agree that Erika spent the weekend of February 9-11, 2007, with Mr. Lima on Grand Canary Island.  Tr. at 68:3-8, 14-19; 74:5-13; 133:14-25; Exh. 36 at ¶ 6.  Mr. Lima picked Erika up on Friday, February 9 in Tenerife, took her to his home, cared for her during the weekend, and returned her to Tenerife on Sunday, February 11.  *Id.*  According to Mr.

Lima, at the request of Ms. Garcia, Erika spent the following weekend, February 16-18, with Ms. Garcia so that Erika could visit her great-grandfather (Ms. Garcia's grandfather). Mr. Lima testified that he intended to again take his daughter to his home the weekend of February 23-25 and called Ms. Garcia on Thursday, February 22, 2007, to arrange to pick up his daughter the following day. Tr. at 30:23-31:2-9. When Ms. Garcia did not answer, Mr. Lima spoke with Ms. Garcia's sister, who informed Mr. Lima that Ms. Garcia and Erika had flown to Mexico with Ms. Garcia's other daughter. *Id.*

Although Ms. Garcia agrees Erika spent February 9-11 with Mr. Lima at his home, she said he came to the home on Tenerife where she and Erika were living to pick her up and drop her off. Tr. at 133:14-134:8. Ms. Garcia claims that Mr. Lima visited Tenerife three times between the parties' separation on February 1, 2007, and Ms. Garcia's departure from Spain with Erika on February 21, 2007. Tr. at 133:6-13. Ms. Garcia testified that Mr. Lima last visited the home on Tenerife at which she and her daughters stayed on or about February 16-17, 2007, the weekend Mr. Lima claims he did not see Erika because Ms. Garcia wanted her to be with her great-grandfather. Tr. at 134:19-135:3. Mr. Yenobis Borrego, a distant acquaintance of Ms. Garcia now living in Miami, testified that Mr. Lima even attended a farewell party for Ms. Garcia and her daughters in that home sometime in February, 2007. Tr. at 90:10-16; 92:18-22. Mr. Lima maintains that he only traveled to Tenerife twice during this time period: once on February 9, 2007 to pick up Erika and take her back to Grand Canary Island to spend the weekend with him, and once on February 11, 2007, to return Erika to Tenerife. Mr. Lima claims that on both occasions he went no further than the boat dock on Tenerife, where Ms. Garcia met him with Erika, and did not visit the home where Ms. Garcia and her daughters were residing. Tr. at 67:20-68:22.

It is undisputed that Ms. Garcia flew from Spain to Mexico on February 21, 2007, taking Erika and her older daughter with her.  Shortly after arriving in Mexico, Ms. Garcia crossed illegally with Erika and her older daughter into the United States via the land border, where Ms. Garcia and her children were permitted to remain pursuant to the Cuban Adjustment Act.  Ever since, they have lived in the Miami area.  Tr. at 122:23-123:2; 132:18-25; 133:6-9; 149:16-150:5; Exh. 37.

Ms. Garcia testified that Mr. Lima was always aware of Ms. Garcia's and Erika's travel plans. She also testified that Mr. Lima had consented to Erika's permanent relocation to the United States.

Q.     And was Mr. Lima fully aware … that you were coming to move to Miami?

A.     Yes.

…

Q.     And was Mr. Lima aware of the day you were leaving Spain?

A.     Yes.

Q.     How did he know?

A.     I told him.

…

Q.     So he knew approximately two weeks prior to your departure the day you were leaving?

A.     Yes, because I got the visa from Mexico on the 7th of February of 2007.

Q.     And did that prompt you to tell him your departure date?

A.     Exactly.  The exact date of departure.

Tr. at 132:14-17; 135:4-8, 13-19.  *See also* tr. at 127:25-128:9.

Mr. Lima, on the other hand, testified that he did not know beforehand of Ms. Garcia's trip, that he never consented to or knew about Ms. Garcia's intention to relocate with Erika to Miami, and

that he authorized only a vacation or tourist travel for Erika to Miami to visit her uncle, Ms. Garcia's brother.  Tr. at 25:24-27:24; 30:23-31:12.  Mr. Lima testified that he first learned of Ms. Garcia's departure from Spain with Erika on February 22, 2007, the day after they left.  Mr. Lima stated, and the documentary evidence corroborates, that he made telephone calls in rapid succession to his attorney, the Spanish police, his wife, and his place of work on the afternoon of February 22, 2007.  Exh. 35.  That same afternoon, Mr. Lima also filed a certified statement with the Spanish national police reporting Ms. Garcia's wrongful removal of Erika.  Exh. 16.  According to the police statement, Mr. Lima told the authorities that approximately one month prior, Ms. Garcia "told [him] that she wanted to visit the United States with her daughter and to this end, [he] signed a paper for her so that his daughter could leave the country, but at no time did she tell him that she was leaving for good."  Mr. Lima filed a second certified statement with the police on the following day, reporting that he had spoken with Ms. Garcia and that she had confirmed that she was in the United States after having crossed over from Mexico. Exh. 18.  On February 28, 2007, Mr. Lima filed a third certified police statement, reporting the address in Hialeah, Florida at which he believed Ms. Garcia to be staying based upon information provided to him by third parties and confirmed by Ms. Garcia.  Exh. 19.

On March 8, 2007, Mr. Lima filed a complaint in the Spanish courts, demanding, among other things, Erika's return to Spain and custody of Erika.  Exh. 20.  On or about May 10, 2007, Mr. Lima filed a Request for Return ("Request") with the Spanish Ministry of Justice, that country's central authority for purposes of the Convention.  Exh. 22.  Some ten months later, on March 17, 2008, the Spanish government transmitted the Request to the United States central authority for the Convention, the National Center for Missing and Exploited Children.[4]  Exh. 23.  The reason for the

---

[4] The Central Authority for the United States changed to the Department of State on April 1, 2008.

10-month gap between Mr. Lima's filing his Request and the Spanish central authority's transmittal of it to the United States is not clear from the record.

Mr. Lima visited Miami between August 18 and September 11, 2007.  Tr. at 43:5-23; 139:25-140:5; 140:15-21.   For about the first two weeks, he stayed with Ms. Garcia and Erika, celebrating Erika's second birthday on September 2, 2007.  During his stay, Mr. Lima visited Erika's daycare, and Mr. Lima and Ms. Garcia traveled to Disneyworld with Erika.  Tr. at 108:4-7; 145:9-13.  The parties dispute what occurred the final week.  Ms. Garcia claims that Mr. Lima left her home on September 3, 2007, and she believed he had returned to Spain.  Tr. at 139:25-140:21.  Mr. Lima claims that Ms. Garcia kicked him out of her home on September 3, that he was forced to stay elsewhere for the final week of his visit, and that Ms. Garcia denied him contact with his daughter for that week and several months thereafter.  Tr. at 43:5-21.

Mr. Lima testified that he had contact with Erika through the Respondent, but that such contact was intermittent.  He testified that on two occasions the Mother fully cut off his contact with Erika – for about six months after his August/September 2007 visit to Miami and again in August 2008, after he had her served with papers in the Spanish custody proceeding.  Tr. at 43:22-44:4; 51:23-52:3. According to the Respondent, she never prevented Mr. Lima from talking with Erika or learning information about her.  Tr. at 140:22-141:9.  It is, however, undisputed that Petitioner had frequent contact with the daycare Erika attended for most of 2007 and in that way obtained information about Erika.  Tr. at 44:18-24; 106:19-107:1; 107:5-14; 108:4-7; 108:16-109:2; 109:8-110:9; 144:5-12.  It is also undisputed that Mr. Lima sent at least two care packages to Erika, containing such items as clothing, shoes, and other personal items.  Tr. at 40:17-41:11;143:15-144:12.  Also undisputed is that Mr. Lima sent pictures and videotapes of himself and obtained photographs of

Erika through the school.  Tr. at 45:2-3; 109:8-110:9.  The evidence thus suggests that Mr. Lima, at least, found it difficult or undesirable to communicate with Erika through Ms. Garcia.

It is undisputed that in early August of 2008, Ms. Garcia traveled alone from Miami to Spain and, on August 11, was sworn in as a Spanish citizen at the Civil Registry in Telde, Grand Canary Island.  Ex. 28; tr. at 48:18-23; 142:16-143:2.  Mr. Lima testified that he did not know beforehand of Respondent's travel plans.  Tr. at 48:24-49:2.  He stated that while he learned in July 2008 that Respondent's application for Spanish citizenship had been granted (because the notice was sent to his home), tr. at 47:14-19, when he telephoned Ms. Garcia to inquire whether she would go to Spain to take the required oath of Spanish citizenship, she told him that she no longer was interested in becoming a Spanish citizen.  Tr. at 48:13-17.  Respondent, on the other hand, testified that Mr. Lima knew she intended to return to Spain for her citizenship and also knew exactly when she was traveling to Spain.  Tr. at 142:11-13.  She further testified that she asked Mr. Lima if Erika should accompany her, and he told her no.  Tr. at 142:14-18.  It is undisputed that, pursuant to the requirements of Spanish law, on August 11, 2008, Ms. Garcia took an oath of allegiance to the King of Spain and of obedience to the laws of Spain.[5]

There is also no dispute that on August 18, 2008, Mr. Lima's wife observed Ms. Garcia on a bus in Telde and followed her to the Civil Registry building so that Spanish authorities there could serve Ms. Garcia with the custody suit papers.  Tr. at 49:10-16; 143:3-8.  There, a process server served Ms. Garcia with a copy of the complaint in the Spanish custody case, as well as an order that

---

[5] Ms. Garcia testified that she took an oath of Spanish citizenship, but did not recall its content.  Tr. at 151:7-13.  Spanish government records indicate that Ms. Garcia was sworn in as specified by article 23 of the Spanish Civil Code.  Exh. 28.  This Court takes judicial notice of article 23's provision that the oath be one of loyalty to the King and obedience to the laws of Spain.  Fed.R.Civ.P. 44.1  ("The court, in determining foreign law, may consider any relevant material or source ... whether or not submitted by a party ... The court's determination [of foreign law] shall be treated as a ruling on a question of law.").  *See generally Seguros Del Estado, S.A., v. Scientific Games, Inc.,* 262 F.3d 1164, 1171 (11th Cir.2001) (citing *United States v. Gecas,* 120 F.3d 1419, 1424 (11th Cir.1997)).

she appear at a hearing in the custody matter on October 9, 2008, that she surrender Erika's passport, and that she provide a Spanish address for service of legal documents in the custody case.  Exh. 29; tr. at 49:17-50:3; 143:9-11; 152:7-20.  Ms. Garcia indicated that Erika was in the United States and that she did not have Erika's passport with her.  Exh. 29; tr. at 152:10-16.[6]  There was testimony that Ms. Garcia stated to the process server that she had no intention of appearing at the October 9 hearing.   Ms. Garcia returned to Miami shortly after.

On September 3, 2008, Mr. Lima, through pro bono counsel, filed the instant Verified Petition for Return of Minor Child to the Kingdom of Spain and Emergency Petition for Warrant of Arrest in Lieu of Writ of Habeas Corpus [DE 1].    Following an *ex parte* evidentiary hearing on September 12, 2008, the Court issued a warrant for the arrest of Erika and ordered that she be delivered to Mr. Lima and reside with him pending further Order.  [DE 8].  The Court also appointed Ms. Karina Lapa, a licensed mental health counselor, as guardian *ad litem* and liaison between Mr. Lima and Ms. Garcia to coordinate and supervise twice weekly visits between Ms. Garcia and Erika.[7] *Id.*  Law enforcement officers executed the warrant on September 16, 2008, and this Court set a final hearing in this matter for September 23, 2008.   DE 9.   The evidentiary hearing was held on September 23, 24, and 25, 2008, during which both parties were afforded the opportunity to present testimony and evidence.[8]

---

[6] As indicated above, Ms. Garcia stated that Mr. Lima knew exactly when she was to arrive in Spain. Mr. Lima, on the other hand, testified that after she had denied any interest in Spanish citizenship and any intent to return to Spain for that purpose, he only learned of her arrival in Spain when friends called him from the Madrid airport on August 10 and advised him that they had seen her there.

[7] At the conclusion of the Final Hearing on September 25, 2008, the Court ordered that the supervised visitations be increased to four times per week and to two hours per visitation.  The Court acknowledges and thanks Ms. Lapa for the important services she has provided in this matter to Erika and her parents.

[8] On September 12, 2008, the Court ordered Respondent to surrender the child's passport to the Court through the guardian *ad litem* at the first supervised visitation.  DE 8 at 3, ¶ 7.  The Order was served upon Respondent by both the U.S. Marshals Service at the time the arrest warrant was executed on September 16 and by Ms. Lapa on September 17.  DE 11.  Respondent refused to comply with the Order

Having reviewed the entire record, including the evidence and testimony presented by both parties and the argument made by counsel, the Court finds that Ms. Garcia wrongfully removed Erika from Spain, her place of habitual residence, first to Mexico and then to the United States, on or about February 21, 2007.  The Court further finds that Respondent has failed to meet her burden on any of the three defenses she has asserted.   Accordingly, as authorized by the Hague Convention and ICARA, I respectfully recommend that the Petition be granted and that the Court order Erika to be returned to Spain with Mr. Lima forthwith.

### IV. Legal Analysis Under the Hague Convention and ICARA

**A. The Habitual Residence of Erika Immediately Before Her Removal Was Spain.**

In this case, there is no question that Spain is the applicable habitual residence for Erika. Spain is the only country in which Erika lived prior to the removal at issue.  Moreover, Respondent concedes this point.  Tr. at 189:3-8.  Thus, the Court finds by a preponderance of the evidence that Spain was the habitual residence of Erika immediately before her removal to Mexico and the United States.

**B. The Removal Breached Mr. Lima's Custody Rights Under Spanish Law**

The Hague Convention establishes that the law of the country in which a child was habitually resident governs decisions as to whether custody rights existed at the time of removal, and it permits judicial notice to be taken of that country's law.   *See* Convention, art. 14.   *See also Shealy v. Shealy,* 295 F.3d 1117, 1123 (10th Cir. 2002), and Fed. R. Civ. P. 44.1.  Having found that Spain was the habitual residence of Erika, I take judicial notice of Articles 108, 154, 156, 159, 160, 169, and 170 of the Spanish Civil Code, applicable at the time of Erika's removal.  Exh. 40.

---

at the time of the first visitation.  *Id.*  Further, she failed to surrender the passport until the conclusion of the first day of the final hearing on September 23, 2008, when Petitioner's counsel brought the issue to the attention of the Court.  Tr. 83:5-14.

Under Spanish law, parental authority ("*patria potestad*") includes the right to make decisions regarding a child's education, well-being, protection, upbringing, and place of residence. Declaration of Ramses Abad Roset, Spanish attorney-at-law, at ¶¶ 6-8, Exh. 39 (Abad Declaration).[9] Spanish law provides that parental authority is to be exercised by both parents, unless a court determines that only one parent is to exercise parental authority or one parent agrees to the other's sole exercise of parental authority.  *See* Article 156 and Abad Declaration at ¶ 4.

In this case, a Spanish court never deprived Mr. Lima of his parental authority.  Indeed, there appears to have been no basis for doing so.  Spanish law considers stripping a parent of parental authority to be a "drastic measure" which is authorized in cases of "failure to perform the duties inherent therein."  *See* Article 170, Abad Declaration at ¶ 9, and case law cited therein.  There is no evidence that Mr. Lima ever failed to perform the duties of parenthood.  To the contrary, the evidence demonstrates that Mr. Lima fulfilled his parental responsibilities by providing a home for his daughter, paying for her schooling, tending to her medical needs, and interacting with her.  Exh. 5-8; tr. at 17:24-19:20.

Ms. Garcia argues that she possessed sole custody over Erika following the parties' February 1, 2007 separation because Erika was living primarily with Ms. Garcia.  Tr. at 190:6-7.  Ms. Garcia relies upon the last paragraph of Article 156, which provides: "If parents are living separately, parental authority will be <u>exerted by</u> the one with whom the child is living."  (emphasis added)  Ex. 40; tr. at 189:17-190:7.  While at first blush, the cited provision appears to support Ms. Garcia's position, the Abad Declaration makes clear that Spanish law distinguishes the "exertion" of parental authority from "possession" of parental authority.  Abad Declaration at ¶ 2.  Where parents live

---

[9] "Such affidavits are an acceptable form of proof in determining issues of foreign law, *see* Rule 44.1, Fed.R.Civ.P., and are likewise permitted under the Hague Convention, *see* Explanatory Report ¶ 101, at 456-57 ('proof of the substantive law of the State of the child's habitual residence may be established by either certificates or affidavits')."  *Whallon v. Lynn*, 230 F.3d 450, 458 (1st Cir. 2000).

separately, one parent necessarily "exerts" or "exercises" parental authority while the child is under his or her care. *Id.* at ¶¶ 4 and 6 and case law cited therein. Here, however, both the mother and father were exercising parental authority. Because Erika was living primarily with Ms. Garcia in the three weeks between the parties' separation and Erika's removal from Spain, she primarily exercised parental authority over day-to-day decisions related to Erika. However, Mr. Lima likewise exercised parental authority over Erika when she was under his care, such as during the weekend (February 9-11, 2007) that Erika spent with him within days of her removal from Spain. Thus, I find that Mr. Lima did not forfeit or otherwise lose parental authority or custody rights simply because he allowed Erika, who was less than a year and a half old at the time her parents separated, to live primarily with her mother.

Additionally, Mr. Abad explains that, under Article 156 of the Spanish Civil Code, even where one parent is exclusively *exercising* parental authority in day-to-day affairs, the other parent maintains *possession* of parental authority over fundamental decisions in the education and upbringing of the child, including where the child is to reside, a central issue in this case. *Id.*

Other federal courts have explained that "*patria potestad,*" derived from ancient Roman law and existing in many civil law countries, "provide[s] for the joint exercise of parental authority ...." *Garcia v. Angarita*, 440 F. Supp. 2d 1364, 1379 (S.D. Fla. 2006); *Lalo v. Malca*, 318 F. Supp. 2d 1152, 1155 (S.D. Fla. 2004).[10] "*Patria potestad*" is a custody right. *Id.* at 1155-1156; *Lynch v. Mendez*, 220 F.Supp.2d 1347 (M.D. Fla. 2002) (same). *See also Whallon v. Lynn*, 230 F.3d 450 (1st

---

[10] The Panamanian law cited in *Lalo* is, not surprisingly, extremely similar to that of Spain, whose legal tradition was the basis for the legal systems throughout its former colonies in Latin America. *Patria potesdad* is alternatively referred to as "*patria potestas.*"

Cir. 2000) (holding unmarried father possessed custody rights under Mexican "*patria potestas*" where no judicial custody determination of formal custody agreement).[11]

Moreover, ICARA establishes that a removal or retention is wrongful when it occurs before the entry of a custody order.  42 U.S.C. § 11603(f)(2).  Here, there was no custody order in effect at the time Respondent removed Erika from Spain.  Tr. at 76:21-77:1; 190:7.  Erika was living primarily with Respondent only by temporary agreement of the parents.  Thus, Erika's removal from Spain was wrongful under ICARA.

Accordingly, I find that Mr. Lima possessed custody rights under Spanish law at the time of Erika's removal because he both possessed and exercised his *patria potestad* custody rights up to the date Erika was removed from Spain.  Therefore, if Ms. Garcia took Erika from Spain to Mexico and then to the United States to live without Mr. Lima's consent, it was a violation of Mr. Lima's custody rights.

### C. Mr. Lima Was Exercising Custody Rights at the Time of the Removal

The evidence demonstrates that Mr. Lima exercised parental authority relating to Erika from the time she was born and continued to do so up until Ms. Garcia removed Erika from Spain.  As set forth above, the evidence demonstrates that Mr. Lima provided a home for his daughter, paid for her schooling, tended to her medical needs, and interacted with her.  Although the parties dispute their respective level of involvement with Erika's care, it is clear that Mr. Lima supported his daughter and was involved in her life.  Moreover, "a person with valid custody rights under the law of the country of the child's habitual residence cannot fail to exercise those rights 'short of acts that constitute clear and unequivocal abandonment of the child.'"  *Bocquet*, 225 F.Supp.2d at 1346 (citing *Friedrich*, 78 F.3d at 1066).  There certainly is no suggestion that Mr. Lima at any time abandoned Erika.

---

[11] As in *Whallon*, "[t]his case highlights the difficulties in imposing Anglo-American definitions of custody on legal systems … that have different origins and traditions."  230 F.3d at 456 n.7.

In sum, I find that Mr. Lima was exercising his custody rights at the time of Erika's removal. Thus, I also conclude that pursuant to the Convention and ICARA, Mr. Lima has proven by a preponderance of the evidence that in February 2007, Ms. Garcia wrongfully removed Erika from Spain - Erika's habitual residence at that time.

## V. Defenses

Under the Hague Convention and ICARA, 42 U.S.C. § 11603(e)(2)(B), unless Ms. Garcia can establish that one of the following four defenses[12] applies, Erika must be returned to Spain:

(a) The person seeking return of the child consented to or subsequently acquiesced in the removal or retention. Convention, art. 13a.

(b) The proceeding was commenced more than one year after the removal of the child *and* the child has become settled in his or her new environment. Convention, art. 12.

(c) There is a grave risk that the return of the child would expose it to physical or psychological harm. Convention, art. 13b.

(d) The return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Convention, art. 20.

The Court must construe all four of these defenses narrowly.  *See Friedrich,* 78 F.3d at 1067. "Were a court to give an overly broad construction to its authority to grant exceptions under the Convention, it would frustrate a paramount purpose of that international agreement -- namely, to 'preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.'"*Blondin v. Dubois,* 189 F.3d 240, 246 (2nd Cir. 1999) (internal citation

---

[12] The Convention itself does not contain a particular term for these provisions.  ICARA refers to them as "exceptions," 42 U.S.C. § 11603(e)(2), while much of the case law uses the term "defenses." *See, e.g., Bocquet*, 225 F.Supp.2d at 1347.  For convenience, the term "defense" will be used herein.

omitted). And even if a defense is satisfactorily proven, "the courts retain the discretion to order return." *Bocquet*, 225 F.Supp.2d at 1347 (citing *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995) (citing Pub. Notice 957, 51 Fed.Reg. 10494, 10509 (1986))).

Ms. Garcia asserts the first two listed defenses, both of which she must prove by a preponderance of the evidence, as well as the third, which she must prove by clear and convincing evidence.   *See* 42 U.S.C. § 11603(e)(2).   First, she argues that Mr. Lima consented to Erika's permanent removal to the United States as evidenced by his execution of the Permission to Travel. Second, Ms. Garcia argues that Mr. Lima failed to commence proceedings within one year of the alleged removal, and that Erika is "settled" in her new environment.   Third, she argues that there is a grave risk that Erika's return to Spain will expose her to physical or psychological harm.

## A. Mr. Lima Did Not Consent to Erika's Removal from Spain or Acquiesce to Her Retention in the United States

### 1.   Consent

The central dispute in this case is whether Mr. Lima knew in advance about and consented to Ms. Garcia's plans to permanently relocate with Erika to Miami.  Ms. Garcia claims Mr. Lima knew about and consented to Erika's removal from Spain.  Mr. Lima vigorously denies any knowledge of or consent to Ms. Garcia's plans and presented substantial testimony and documentary proof refuting Ms. Garcia's contentions.   In examining consent defenses, courts consider whether the petitioning parent "harbored a *subjective* intent to permit the respondent 'to remove *and* retain the child for an indefinite or permanent time period.'"   *Baran v. Beaty*, 479 F. Supp. 2d 1257, 1267 (S.D. Ala. 2007) (first emphasis added); *see also Garcia v. Angarita*, 440 F. Supp. 2d 1364, 1380 (S.D. Fla. 2006); *Pesin v. Osorio Rodriguez*, 77 F. Supp. 2d 1277, 1288 (S.D. Fla. 1999).  In this case, the evidence shows that Mr. Lima did not intend to permit Ms. Garcia to permanently or indefinitely relocate Erika to the United States.  I reach this conclusion for several reasons.

17

**The Permission to Travel and Mr. Lima's Actions Before Erika's Removal**

Mr. Lima's actions *before* Erika's removal are inconsistent with consent. Both Mr. Lima and his Spanish attorney, Francisco José González Peña, credibly testified that prior to Erika's removal, Mr. Lima consulted an attorney for the purpose of initiating custody proceedings in Spain. Tr. at 32:21-33:1; 170:11-15.[13] If Mr. Lima truly harbored a subjective intent to permit Erika to move to the United States with Ms. Garcia, he would have had no reason to consult an attorney about custody proceedings in Spain. Moreover, the Court is persuaded that Mr. Gonzalez informed Ms. Garcia about Mr. Lima's intention to file a custody proceeding before she left Spain on February 21, 2007.

In addition, Mr. Lima executed a "Permission to Travel" document on February 1, 2007. Exh. 13. This exhibit is the only documentary evidence on which Ms. Garcia relies for her contention that Mr. Lima consented to her permanent relocation with Erika to Miami. Ms. Garcia characterized this document as an "authorization for me to come and live in the U.S. with Erica." Tr. at 128:4-14. Ms. Garcia argues that the travel authorization supports her claim that Mr. Lima

---

[13] Shortly after filing his Petition, Mr. Lima filed the sworn declaration of Mr. González, Exh. 15. *See* DE 6. The declaration states that in February 2007, Mr. Lima asked Mr. González to handle custody proceedings related to Erika and, as part of that representation, Mr. González spoke with Ms. Garcia by telephone and advised her that Mr. Lima intended to initiate a lawsuit in Spain. On the second day of the Final Hearing, Ms. Garcia flatly denied ever speaking to any attorney for Mr. Lima. Tr. at 137:13-138:21. The Court announced its concern about Mr. González's declaration. Tr. at 148:3-10. Within hours of the close of evidence at the Final Hearing, Mr. Lima moved to reopen his case for the limited purpose of allowing the Court and Respondent's counsel to question Mr. González about his declaration. DE 17. At the beginning of day three of the Final Hearing, the Court granted the motion, tr. at 164:4-15, and Mr. González appeared by telephone from Spain. Both the Court and Respondent's counsel questioned him under oath. Tr. at 167-176. Mr. González testified, consistent with his declaration, that he was hired by Mr. Lima in early 2007 to represent him in custody proceedings, that he talked with Ms. Garcia by telephone in February 2007, and that he informed her that a lawsuit would be filed related to the custody of Erika. The Court finds that Mr. González was an intelligent, knowledgeable, and forthright witness. His testimony was balanced. He admitted, for example, that he did not independently confirm the identity of Ms. Garcia, but testified that the person with whom he spoke identified herself as Ereneidy Garcia Martin and provided details about her place of residence and her intention to remain in Tenerife and not move back to Grand Canary Island. The Court finds Mr. González to be a credible witness.

consented to Erika's permanent removal from Spain.  Mr. Lima testified that he executed the travel authorization at Ms. Garcia's request so that she and Erika could travel to the United States to visit Ms. Garcia's brother and that no dates for travel are indicated because Ms. Garcia did not know when she would make the trip.  Tr. at 25:25-26:5.  Mr. Lima contends that the travel authorization supports his claim that he agreed only to allow Erika to *visit* Miami but did not consent to her permanent relocation.

I find that the travel authorization supports Mr. Lima's position that he did not consent to Erika's permanent removal to and retention in the United States.   The document is entitled "PERMISSION TO TRAVEL" and says nothing about Erika permanently moving or relocating to the United States.  *See Giampaolo v. Erneta*, 390 F. Supp. 2d 1269, 1283 (N.D. Ga. 2004) (refusing to construe a travel authorization as consent because "[t]he very title of the consent letter—'Authorization to Travel'—indicated that the document was intended to authorize *travel*, as opposed to permanent relocation").  Ms. Garcia could have demanded that the authorization letter say "relocate" or "move" to the United States instead of "travel," but there is no evidence that she did so. Moreover, Mr. Lima submitted a declaration from the notary who prepared the travel authorization. Exh. 14.  The notary states that Mr. Lima expressed to him, prior to executing the document, that "he did not wish to lose his daughter, he wanted her with him and that the permission was being given … on a temporary basis …."  This evidence strongly suggests that the parties never agreed that the document was intended to authorize permanent relocation.[14]  In addition, this Court has stated that "[t]he fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the convention."

[14] Civil law notaries must have a law degree and "act as public officials, serving as impartial legal advisers to both sides of a transaction. … Once both parties understand and are in agreement, the civil law Notary drafts a document executing the transaction."  *See* "Common Law & Civil Law Notaries," *supra* n.2 at 2.

*Garcia v. Angarita*, 440 F. Supp. 2d 1364, 1380 (S.D. Fla. 2006) (holding that the petitioner's agreement to allow his children to travel to the United States for a brief visit did not constitute consent to their relocation).

It is true that the travel authorization executed by Mr. Lima does not indicate when Ms. Garcia and Erika were to leave Spain or when Mr. Lima expected them to return.  However, courts in similar cases have rejected consent defenses that were based on much broader travel authorizations than the one in question here.  In *Mendez Lynch v. Mendez Lynch*, the petitioner father, upon the birth of each of his two sons, executed official documents granting the respondent mother permission to travel outside Argentina with their children.  220 F. Supp. 2d 1347, 1350 (M.D. Fla. 2002).  After the mother relocated the family to Miami, the father sought return of his two children, and the mother asserted a consent defense based on the authorizations.  The court held:  "The evidence is clear that the written consents to travel were given to facilitate family vacation-related travel, not as consent to unilaterally remove the children from Argentina at the sole discretion of Respondent."  220 F. Supp. 2d at 1358; *see also Yang v. Tsui*, No. 2:03-cv-1613, 2006 WL 2466095 (W.D. Pa. Aug. 25, 2006) (letter authorizing father to travel with child to the United States, without any time or geographic limitations, did not support consent defense because mother's intent was that the child be with her father while the mother recovered from surgery).  Ms. Garcia contends that because Mr. Lima hired the notary that drafted the Permission to Travel, and because he testified that he told the notary the permission was solely for travel, the documents should be construed against Mr. Lima.   But the Permission to Travel is not a contract, and that contract principle is thus inapposite in this family law context.  Nevertheless, in light of the significant consequences of one parent's granting consent for a minor child to permanently relocate to another country, these courts understandably require a clear and unequivocal statement of such intent before finding such consent.  This Court finds that the

Permission to Travel does not contain the requisite statement of intent to allow permanent relocation and is, to the contrary, evidence that before Ms. Garcia removed Erika from Spain, Mr. Lima did *not* consent to her permanent relocation outside of Spain.

### Mr. Lima's Post-Removal Actions Are Also Inconsistent with Consent

Mr. Lima's actions ***after*** Erika's removal are also inconsistent with consent. It is undisputed that on February 22, 2007, Mr. Lima telephoned in a short period of time Ms. Garcia's older daughter's boyfriend, Mr. Lima's attorney, the police, his wife, and his employer. Tr. at 31:13-16; Exh. 35.  He testified that he learned for the first time of Erika's removal from Ms. Garcia's daughter's boyfriend, then called the police to report it, his place of work to say he could not come in, and his attorney for advice.  His phone records corroborate this.

There is uncontradicted evidence that Mr. Lima reported Erika's removal to the Spanish police on February 22, 2007—the day he testified he learned that Ms. Garcia had left Spain with Erika—and supplemented that report on February 23 and February 28, 2007.  Exhs. 16, 18-19; tr. at 35:6-8.  On February 23, Mr. Lima informed the Spanish police that he had spoken with Respondent by telephone and that she had confirmed that she was in the United States after having crossed over from Mexico.  Exh. 18.  On February 28, Mr. Lima reported the address in Hialeah, Florida at which he believed Ms. Garcia to be staying based upon information provided to him by third parties and confirmed by Ms. Garcia.  Exh. 19.  If he had, in fact, known and approved of the relocation of his daughter to the United States, it is implausible that Mr. Lima would not have already known where his daughter would be staying.  It is likewise unlikely that Mr. Lima would not have reported this information to the police with his earlier police report if, as Ms. Garcia testified, she had provided it to Mr. Lima on the second day after she arrived in Miami, tr. at 138:22-139:6.[15]

---

[15] Ms. Garcia's cellular telephone records, Exh. 17, show that Ms. Garcia made five calls from Mexico on February 21 and 22, 2007.  Had Mr. Lima actually known of Ms. Garcia travel plans, she presumably would have called him from Mexico to advise him of his daughter's safe arrival – and not waited until

The evidence also shows that Mr. Lima acknowledged to the Spanish police at the time of Erika's removal that he had signed the Permission to Travel, but he described it even then as permitting vacation travel only, not permanent relocation.  Exh. 16.  All of this evidence is consistent with Mr. Lima's version of events and his claim that he learned for the first time on February 22, 2007 of Ms. Garcia's plans to remove Erika from Spain.

In March 2007, Mr. Lima filed in the Spanish court his custody complaint, including a statement of intention to pursue Erika's return to Spain through the Hague Convention, Exh. 20, further suggesting that he did not consent to Erika's removal.  *See In re Leslie*, 377 F. Supp. 2d 1232, 1248 n.27 (S.D. Fla. 2005) ("a seeking of custody undertaken even after removal of a child from the habitual place of residence is a valid indicator of a parent's disagreement to the removal of the child").  In May 2007, Mr. Lima filed his Request for Erika's return with the Spanish government  pursuant to the Hague Convention, another act inconsistent with consent.  *See, e.g. Tabacchi v. Harrison,* 2000 WL 190576, *11 (N.D. Ill. 2000) (holding that petitioner's persistent efforts to keep the child and his subsequent filing of the Hague petition undermined any claim of consent); *Lops,* 140 F.3d at 945 n.26 (evidence amply supported district court's finding that petitioner never consented or acquiesced but rather made concerted efforts to locate the children through international, national, and local agencies).

Ms. Garcia claims Mr. Lima consented to Erika's removal as part of an agreement by which Ms. Garcia sold Mr. Lima her interest in their home in exchange for Mr. Lima's permission to move to Miami with Erika.  Tr. at 127:25-128:3.  Ms. Garcia testified that Mr. Lima was fully aware of her intention to move to Miami with Erika, that he knew they would travel through Mexico, and that he knew in advance what day they would be leaving Spain.  Tr. at 132:14-17; 133:1-3; 135:4-10.

---

two days after arriving in Miami to do so.

The only evidence supporting the agreement Ms. Garcia alleges the parties reached is Ms. Garcia's testimony.  The alleged agreement was never reduced to writing, even though Ms. Garcia testified that she and Mr. Lima went to a notary's office together to execute the documents necessary to carry out their agreement.  Tr. at 127:25– 28:3.  The "Dissolution of Condominium" executed by Mr. Lima and Ms. Garcia on February 1, 2007, Exh. 11, is silent about Ms. Garcia selling her share of the condominium—or her right to live there—in exchange for Mr. Lima's permission to move to Miami with Erika.  Rather, it states that Mr. Lima was to pay Ms. Garcia twelve thousand Euros for her share, and that Mr. Lima was being awarded the property "because the award thereof to each of the joint tenant owners individually would considerably decrease the value of the dwelling due to the division thereof and also because said properties are not divisible."  Exh. 11 at 10.[16]  For the reasons already set forth above, the Permission to Travel is not a document memorializing the alleged agreement.  The Court further finds it implausible that a father who has gone to the extreme lengths Mr. Lima has to secure the return of his daughter after her removal would have bargained away his right to have her near him in exchange for the relatively small sum the mother contends she "paid" for the purported right to remove Erika from Spain.

Mr. Lima's account of Ms. Garcia's departure from Spain is quite different.  Mr. Lima testified that he and Ms. Garcia had agreed that Erika would spend the weekend of February 23-25, 2007 with Mr. Lima.  Tr. at 30:23-31:1.  Mr. Lima stated that on Thursday, February 22, 2007, he called Ms. Garcia to arrange to pick up his daughter the following day.  Tr. at 31:2-9.  When nobody answered, Mr. Lima called Ms. Garcia's sister, who informed Mr. Lima that Ms. Garcia and Erika had flown to Mexico with Ms. Garcia's other daughter.  *Id.*

---

[16] The dissolution document also states that Ms. Garcia would use her twelve thousand Euros "to purchase a new dwelling."  Exh. 11 at 10-11.  The document does not specify that the new dwelling will be in Spain, but there is no evidence that Ms. Garcia ever purchased a home in Spain or anywhere else.

I credit Mr. Lima's account of Ms. Garcia's departure.  There is no evidence that Ms. Garcia's obtaining her equal share of the equity in the jointly owned condominium was tied to Mr. Lima's consent to Erika's permanent relocation (or even temporary travel) to Miami.  Rather, the secretive nature of her departure with Erika suggests that Mr. Lima did not consent.  *See Friedrich*, 78 F.3d at 1069 ("Mrs. Friedrich did not inform Mr. Friedrich that she was departing.  The deliberatively secretive nature of her actions is extremely strong evidence that Mr. Friedrich would not have consented to the removal of Thomas."); *Garcia*, 440 F. Supp. 2d at 1380 ("The evidence of the deception Respondent perpetrated on Petitioner regarding the children's departure . . . overwhelmingly supports the finding that he did not consent to their permanent residence in the United States."); *Baran*, 479 F. Supp. 2d at 1269 ("Where a respondent engages in deception to effectuate a child's removal . . . such facts militate strongly against a finding of consent . . . .").  I find that Ms. Garcia left Spain with Erika without telling Mr. Lima she was going.  She arrived in Mexico and called several people, but not Mr. Lima, according to her own phone records.  She had permission to travel to Miami but no dates had been agreed to or decided.  I find that Mr. Lima's actions both before and after Erika's removal are entirely inconsistent with his alleged consent.

Ms. Garcia also relies on the testimony of several witnesses to support her claim that Mr. Lima knew of, and agreed to, her plan to move to Miami with Erika.  Yenobis Borrego testified that he was at Ms. Garcia's sister's house in February 2007 and observed Mr. Lima speaking by telephone to Ms. Garcia's brother in Miami.  Tr. at 90:17-91:14.  Mr. Borrego testified that he and several other people had come to the house to bid farewell to Ms. Garcia and her daughters.  *Id.* at 92:16-22.  Mr. Borrego recalled overhearing Mr. Lima ask Ms. Garcia's brother to take care of his daughter.  *Id.* at 92:8-15.  Mr. Borrego's impression from overhearing Mr. Lima's portion of that telephone conversation was that Mr. Lima knew Erika would be moving to Miami.  *Id.* at 92:16-22.

I discredit Mr. Borrego's testimony for several reasons.  While he claims to have overheard a substantial portion of Mr. Lima's telephone conversation, he also testified that he "couldn't go over and greet [Mr. Lima] because he was talking on the phone."  Tr. at 90:17-22.  This testimony suggests that Mr. Borrego was not close enough to Mr. Lima to overhear anything.  Even more troubling is Mr. Borrego's admission on cross-examination that he "was there just a moment."  *Id.* at 95:20-23.  Mr. Borrego was asked twice about the phone Mr. Lima was using but could not explain whose phone it was or if it was a cell phone.  *Id.* at 95:18-23.  In closing argument, Respondent's counsel candidly acknowledged that Mr. Borrego "was not the best witness."  Tr. at 194:15-16.

Mr. Lima testified that he did not attend any kind of "farewell party" at Ms. Garcia's sister's house, was never in any home in Tenerife in February 2007, and has never seen Mr. Borrego before in his life.  *Id.* at 155:8-14.  Ms. Garcia did not introduce any evidence, such as a photograph or declarations from family members or other guests, to counter Mr. Lima's testimony and establish that the February 2007 gathering actually occurred or that Mr. Lima was present.

Ms. Garcia's brother, Enrique Garcia, also testified.  He stated that Mr. Lima called him shortly before Ms. Garcia left Spain, said his daughter was coming to live in the United States, and asked Mr. Garcia to help Erika.  Tr. at 98:14-21.[17]  However, as stated above, Ms. Garcia testified that after arriving in Miami, she called Mr. Lima to give him the address and phone number where he could reach his daughter.  *Id.* at 139:2-6.  If Mr. Lima had known his daughter was moving to Miami and when she was leaving, and talked with Mr. Garcia beforehand about this, as Ms. Garcia claims, it stands to reason that he also would have known the address and telephone number in Miami where

---

[17] In support of this argument, Respondent's counsel represented in closing argument that Mr. Lima's telephone records show a "10 minute phone call on February 11 … to a 786 number here in the United States."  Tr. at 199:25-200:2.  As Mr. Lima's counsel has pointed out subsequently, DE 25, the evidence actually shows that the referenced call appears in *Respondent's* telephone records, Exh. 17.

his daughter would be living, and would not have needed to obtain it from Ms. Garcia after she arrived here.

Even if the alleged telephone conversation between Mr. Lima and Mr. Garcia actually occurred, it is not sufficient to establish consent. Courts have held that isolated statements to third parties are not sufficient to establish consent or acquiescence. *See Friedrich*, 78 F.3d at 1070; *Wanninger v. Wanninger*, 850 F. Supp. 78 (D. Mass. 1994). The Court also notes that Mr. Garcia testified that he initially came to the United States to *visit* and stayed, the very conduct of which Mr. Lima accuses Ms. Garcia. Tr. at 97:14-16.

Other than the travel authorization, which I conclude actually supports Mr. Lima's position, Ms. Garcia did not introduce a single document or other piece of evidence in support of her claim that Mr. Lima consented to Erika's removal. In contrast, substantial evidence supports Mr. Lima's contention that he did not consent to Erika's permanent removal and he has consistently and vigorously sought Erika's return to Spain since her wrongful removal. In addition to the evidence that he had begun custody proceedings before February 21, 2007, the evidence post-removal includes the police reports dated February 22, 23, and 28, 2007; Mr. Lima's March 8, 2007 complaint, filed in a Spanish court, demanding Erika's return to Spain and custody of Erika; and Mr. Lima's Request for Return, filed with the Spanish Ministry of Justice in May 2007, and, of course, this Petition.

In addition, Mr. Lima introduced a copy of a May 2007 letter he wrote to Carmen Ortega, the owner of a day care center that Erika attended. Exh. 25. In the letter, Mr. Lima stated: "There is a permit to travel from SPAIN to the U.S., because the country requires this to travel as a tourist. I had to sign it but I never imagined that this situation would arise in which they want Erika to live in this country." Mr. Lima went on at some length in the letter about how much he misses his daughter and stated that he "live[s] in the hope that all of this will pass as soon as possible." These do not sound

like the words of a man who consented to the permanent relocation of his daughter to the United States.[18]   This letter is further evidence that Mr. Lima did not harbor a subjective intent that his daughter move to Florida permanently.

Ms. Garcia's theory of this case, articulated by her attorney during her closing argument, is that Mr. Lima induced Ms. Garcia to sell her interest in their home by agreeing to allow Erika to move to Miami with Ms. Garcia.[19]   Ms. Garcia contends it was Mr. Lima's intention all along to pursue custody of Erika, but only after "tricking" Ms. Garcia into selling her property rights in exchange for permission to relocate Erika.  Tr. at 195:5-6.

The Court finds this theory unpersuasive for several reasons.  First, Ms. Garcia claims she permanently signed away her property rights on February 1, 2007, and that Mr. Lima was fully aware that she was planning to take Erika from Spain to Florida (via Mexico) on February 21, 2007.  If so, one would expect that Mr. Lima would have spent the days between February 1, when the alleged deal was done, and February 21 trying to prevent Erika from leaving Spain with her mother.  He could, for example, have revoked the travel authorization he executed on February 1 and notified Spanish authorities of this fact in order to block the child's departure from Spain.  He could also have

---

[18] Ms. Ortega testified that she never received the letter because "it will not arrive" due to its listing the day care's address in Hialeah, when it is actually located in Hialeah Gardens. Tr. at 110:22-24; 113:21-114:2. Mr. Lima introduced a receipt showing that the letter was mailed using the Spanish postal system, and the court takes judicial notice of confirmation of delivery to the correct zip code. DE 18; tr. at 166:3-11. I find that the letter is authentic and was written and sent on or around May 18, 2007, whether or not it was ever received by Ms. Ortega, which is not relevant to these proceedings. It supports that Mr. Lima's *subjective* intent was only to authorize a tourist trip to Miami.

[19] It was suggested at trial that Spanish law allows a mother who is awarded custody of a minor child to live in the family home, while the father must move out and continue to pay half of the mortgage until the child turns 18. Tr. at 127:18-128:3 (testimony of E. Garcia); 174:6-175:9 (testimony of F. González). When Ms. Garcia's attorney said Ms. Garcia gave up her property rights, tr. at 194:6-8, she may have been referring to her apparent right, *had she been awarded custody* by a Spanish court, to live in the couple's condominium until Erika turns 18. In any event, I conclude that there never was any agreement to give up any such potential right and that the parties' property rights are best determined by the Spanish courts.

filed the complaint seeking custody of Erika and served Ms. Garcia while she was still in Spain.  Mr. Lima's failure to take these or other such steps, and his well-documented actions immediately upon learning of Erika's departure, strongly suggest that he did not know Ms. Garcia planned to leave with Erika on February 21.  The Court found above that the testimony of Mr. Lima's Spanish attorney was credible and that Ms. Garcia knew of the imminent custody action Mr. Lima then intended to initiate in the Spanish court.

Second, when the Court asked Ms. Garcia's counsel why Mr. Lima would make such an agreement and than three weeks later commence fairly monumental efforts to effect Erika's return, counsel stated that, while Mr. Lima "can try and do this"— that is, force the return of Erika to Spain through this proceeding—Ms. Garcia "has already given up her property rights" and "cannot get those back."  Tr. at 194:9-11.  Put differently, Ms. Garcia reasons that Mr. Lima took Ms. Garcia's property rights, then waited until she left Spain so she could not get those rights back, and only *then* commenced his significant efforts to secure his daughter's return.  It simply is not plausible that Mr. Lima consented to Erika's relocation only because he knew he could force her return by initiating a Hague Convention proceeding in the United States.  Obtaining the return of a child through the Hague Convention is a lengthy, expensive, and uncertain undertaking.  I do not believe Mr. Lima's monumental efforts over the last year and a half were voluntarily assumed as part of some grand scheme to swindle Ms. Garcia into selling her interest in a condominium.  As mentioned above, if this had truly been Mr. Lima's intent, revoking the travel authorization after Ms. Garcia had executed the agreement to sell her interest in the parties' condominium, but before she left Spain with Erika, would have been a more efficient and less risky method of effecting it.  Moreover, Ms. Garcia presumably *can* get back any property rights she may have given up on the mistaken belief that she was exchanging those rights for Mr. Lima's permission to move to Florida with Erika.  The Spanish

courts are fully capable of adjudicating such claims, which necessarily involve Spanish real property and family law, documents concerning real property in Spain prepared by a Spanish notary and executed in Spain, and witnesses who are, with the exception of Respondent, located in Spain.

I recognize that the question of whether Mr. Lima consented to Erika's removal and retention is largely one of credibility. As discussed above, Ms. Garcia testified that Mr. Lima was fully aware of her intention to move to Miami with Erika, and that he knew in advance what day they would be leaving Spain. Tr. at 132:14-17; 135:4-10. Ms. Garcia also testified that when she returned to Spain in August 2008 to finalize her Spanish citizenship, Mr. Lima knew the exact date she would be arriving. Tr. at 142:11-13. Ms. Garcia said she offered to bring Erika to Spain with her, but Mr. Lima refused, stating that he wanted more time to spend with Ms. Garcia. Tr. at 142:14-18. But if Mr. Lima knew the date on which Ms. Garcia would arrive in Spain, he almost certainly would have arranged to serve her in the Spanish custody proceeding in an orderly manner. The Spanish court had, on July 27, 2008, already authorized service during the Spanish August holidays. Exh. 27. Mr. Lima testified that he had obtained this authorization upon learning that Ms. Garcia's citizenship application had been granted. Tr. at 47:14-48:10. Instead of there being carefully coordinated service on Ms. Garcia, she herself testified that she was served only after Mr. Lima's wife happened to spot her on a bus and followed her to the courthouse, where Mr. Lima and a process server were by then alerted and prepared to serve her with the papers. Tr. at 143:3-11.

More importantly, it is simply unimaginable that Mr. Lima would tell Ms. Garcia not to bring Erika to Spain with her, when doing so would have accomplished the *very remedy* Mr. Lima seeks here and had at that point already fought for over nearly 18 months — *the return of Erika to Spain*. The papers served on Ms. Garcia included an Order requiring her to surrender Erika's passport to Spanish authorities pending the outcome of the custody proceedings initiated by Mr. Lima in Spanish

court.  Exh. 29.  Thus, had Ms. Garcia actually informed Mr. Lima of her trip to Spain in August 2008 and offered, as she testified, to take Erika with her, Mr. Lima could have accepted the offer and, upon their arrival in Spain, served Ms. Garcia, seized Erika's passport, and ensured her presence in Spain for the October 9 custody hearing.  That he did not and was apparently only by happenstance able to serve Ms. Garcia, leads the Court to conclude that Ms. Garcia never told Mr. Lima she was returning to Spain nor offered to take Erika with her.  Ms. Garcia's testimony regarding her trip to Spain in August 2008 is not credible, and it necessarily undermines her credibility with respect to her testimony relating to her departure from Spain in 2007 and Mr. Lima's purported consent.

In addition, Ms. Garcia's credibility is called further into question because she acknowledged that her signature appears on a document Mr. Lima stated is a handwritten receipt related to 2,300 Euros he paid her for new housing expenses and household effects.  Exh. 12.  Ms. Garcia admits she was paid the 2,300 Euros and that the signature is her own, but emphatically denied that she ever signed such a document.  Tr. at 131:2-22.

Q.      And how is it that your signature is on that document, Ms. Martin?

A.      I swear before this court for the second time, and I ask that they take not only my youngest daughter, but also my oldest because this document is totally false and, therefore, I request the original ….  It had to have been prepared or falsified because I did not sign this. … I have never seen this document and I have not signed it.

In response to Ms. Garcia's sworn testimony, the Court indicated its concern regarding the authenticity of Exibit 12.  Tr. at 147:18-148:2.  After evidence was closed at the conclusion of the second day of the Final Hearing, Respondent's counsel suggested that there was an irregularity in the copy of Exh. 12 in evidence and requested to see the original or that the Spanish court certify that the original, signed document was in its possession.  Tr. at 157:4-17.  Petitioner's counsel immediately

committed to attempting to obtain a certified copy of the document, to be transmitted from the Spanish court directly to Petitioner's counsel in this matter.  Tr. at 158:3-6.  Within 24 hours, Petitioner's counsel obtained and filed another certified copy of the document and a certification from the clerk of the Spanish court that the original document, with blue ink signatures, was contained in the court's file, and that it appeared to have no signs of alteration.  DE 21 and 28.  Then, Petitioner's counsel in Spain obtained authorization from the Spanish court to release the original document and send it directly to this Court via international courier.  DE 28.  The Court received the document from the Spanish court on October 3. DE 34.  The document contains blue-ink signatures and appears not to have been altered or fabricated.  This fact, coupled with Ms. Garcia's admission that the signature is her own and that she received the money mentioned in the agreement, contradicts her fervent denial under oath of ever having seen or signed Exhibit 12.

To the extent that my determination of the consent issue depends on the credibility of Mr. Lima and Ms. Garcia as witnesses, for all of the reasons stated above, I find that Mr. Lima was more credible and I credit his testimony on the issue of consent.

I conclude that Ms. Garcia has not established by a preponderance of the evidence that Mr. Lima consented to Erika's relocation to the United States.

2.    Subsequent Acquiescence

"Although analytically distinct, the defenses of consent and acquiescence under article 13(a) of the Hague Convention are both narrow."  *Garcia*, 440 F. Supp. 2d at 1380.  To prevail on a subsequent acquiescence defense, the respondent must establish one of the following:  (1) an act or statement with the requisite formality, such as testimony in a judicial proceeding; (2) a convincing written renunciation of rights; or (3) a consistent attitude of acquiescence over a significant period of

time. *Id.*; *Pesin*, 77 F. Supp. 2d at 1288.   As with consent, acquiescence is a question of the subjective intent of the petitioner.  *Id.*; *Garcia*, 440 F. Supp. 2d at 1380.

In this case, there is no evidence of either a formal statement by Mr. Lima or a written renunciation of rights.  Therefore, the only question is whether the evidence suggests a consistent attitude of acquiescence on the part of Mr. Lima over a significant period of time.  I find that it does not.

Ms. Garcia's claim of acquiescence is based in part on Mr. Lima's visit to Miami in August and September of 2007.  It is undisputed that Mr. Lima was in Miami from approximately August 18, 2007, to September 11, 2007.  Enrique Garcia testified that he saw Mr. Lima twice during that time, and that Mr. Lima made no mention of wanting to take Erika back to Spain.  Tr. at 101:17-102:6. Mr. Garcia further testified that Mr. Lima and Ms. Garcia interacted "like a normal family" and without friction at a birthday party for Erika.  *Id.* at 101:24-102:2.  Another witness who attended the birthday party, Alberto Rodriguez, also testified that he observed no animosity between Mr. Lima and Ms. Garcia and that Mr. Lima never said anything about Ms. Garcia taking Erika away from him. *Id.* at 119:21-23; 121:4-7.

Ms. Garcia also presented testimony from employees of day care centers that Erika has attended in Miami.  Carmen Ortega, the owner of Magic Kids Learning Center, testified that Mr. Lima called the day care on several occasions to ask how his daughter was doing.  Tr. at 106:19-107:14.  Ms. Ortega also testified that Mr. Lima visited the day care center on two or three occasions during his trip to Miami.  Tr. at 108:4-7.  Ms. Ortega stated that Mr. Lima and Ms. Garcia came to the day care together and appeared to have a "normal relationship" with no animosity.  Tr. at 108:13-15.  Ms. Ortega also testified that Mr. Lima sent a package containing clothing to the day care that was intended for Erika.  Tr. at 108:16-22.  Mr. Lima also sent a camera to the day care and asked the

staff to take pictures of his daughter.  Tr. at 109:19-110:9.  In the course of her interactions with Mr. Lima, both in person and over the phone, Ms. Ortega said she never heard Mr. Lima say anything about Ms. Garcia having taken Erika away from him or Ms. Garcia preventing Mr. Lima from seeing his daughter.  Tr. at 110:16-21.  Noria Napoles, who works at a different day care that Erika attended more recently, also testified that Mr. Lima called to ask about Erika back in January or February of 2008.  Tr. at 116:18-117:1.  Mr. Lima denies ever contacting this second day care,  tr. at 46:3-7.[20]

I find that the evidence presented by Ms. Garcia falls well short of establishing acquiescence on the part of Mr. Lima.  The fact that Mr. Lima visited Erika in Miami and communicated with staff members at Erika's day care does not constitute acquiescence.  *See Bocquet*, 225 F. Supp. 2d at 1350 ("That Ms. Bocquet arranged visits in order to see Noe, and had an indirect way of communicating to Noe . . . is insufficient to constitute the unequivocal acquiescence required to satisfy the Hague Convention.").  Nor does Mr. Lima's failure to raise the issue of Erika's wrongful removal in conversations with Mr. Garcia, Mr. Rodriguez, and Ms. Ortega suggest acquiescence.  Rather, it suggests an understandable decision by Mr. Lima to keep private matters private and not burden others with the details of his custody dispute with Ms. Garcia.  That Mr. Lima, Ms. Garcia, and Erika interacted like a normal family, and without evident animosity, in certain public settings also does not constitute acquiescence.  *See Pesin*, 77 F. Supp. 2d at 1289 (acquiescence determination is not based on "the outside world's perception").  Finally, as with the consent defense, Mr. Lima's vigorous efforts to obtain the return and custody of Erika are inconsistent with a finding of acquiescence.  *See id.* at 1289-90 ("Courts have not found acquiescence, where the petition for the return of the child

---

[20] It makes little sense, especially given Mr. Lima's frequent contact with Erika's first day care, that had he known of the second day care's telephone number or address, he would not have made contact more recently.  This is particularly so once Mr. Lima was aware that he was going to come to Miami for these proceedings and was gathering information to support his request for an arrest warrant and to assist law enforcement in executing the warrant.

was filed shortly after the abduction or where the petitioner vigorously attempted to seek custody of his child through other means shortly thereafter the abduction."); *Garcia*, 440 F. Supp. 2d at 1381 (holding that the petitioner's "decision to rely on the legal process rather than try to persuade Respondent to change her mind does not constitute acquiescence").

Ms. Garcia also testified that Mr. Lima was interested in reconciling with her. Ms. Garcia testified that "he [Mr. Lima] wants to reconcile with me, and I cannot forgive him for what he has done." Tr. at 139:18-21. Ms. Garcia's attorney said during her closing: "The reality of it is [Mr. Lima] got upset when she left because she won't reconcile with him, and he would like to have the perfect little family, but they are split up." Tr. at 197:21-23. However, it is undisputed that Mr. Lima is now married to another woman, and Ms. Garcia herself testified that Mr. Lima's current wife moved in with him shortly after Ms. Garcia moved out. Tr. at 137:5-9. I find it difficult to believe that Mr. Lima ever attempted to reconcile with Ms. Garcia. However, I need not decide that question because the law is clear that attempts at reconciliation do not amount to acquiescence. *See Pesin*, 77, F. Supp. 2d at 1290; *Mendez Lynch*, 220 F. Supp. 2d at 1347. Moreover, a finding of acquiescence on these facts would encourage left behind parents to engage in the kind of self help the Hague Convention was designed to deter, and would not encourage the use of purely legal means to secure the lawful return children that Mr. Lima has employed here.

For these reasons, I find that Ms. Garcia has not established by a preponderance of the evidence that Mr. Lima acquiesced in Erika's retention in the United States.

## B. Erika Is Not Settled in the United States

The Hague Convention requires a court to return a wrongfully removed child to the country from which she has been removed where the proceeding for her return has been commenced in the removed-to country within one year from the date she was removed. Convention, art. 12. A court

must likewise return a wrongfully removed child to her removed-from country even where proceedings have been commenced after one year from the date she was removed unless "it is demonstrated that the child is now settled in its new environment." *Id.* Mr. Lima filed his petition in this Court beyond one year from the date Ms. Garcia wrongfully removed Erika from Spain on February 21, 2007. Ms. Garcia argues that the Court should therefore exercise its discretion not to return Erika to Spain because the child is now well settled in South Florida.[21] Tr. at 195:13-15.

Ms. Garcia's burden is to prove by a preponderance of the evidence that Erika is well settled in her environment. *See* 42 U.S.C. § 11603(e)(2)(B). Courts may consider any relevant factor concerning a child's living arrangements in determining whether a child is settled in her new environment. *See Lops*, 140 F.3d at 946. Factors courts typically consider include the child's age; the stability of the child's new residence; whether the child attends school, daycare, or church regularly; the stability of the removing parent's employment; and whether the child has friends and relatives in the new area. *See In re Ahumada Cabrera*, 323 F. Supp. 2d at 1313–14. Yet being settled "means more than having a comfortable material existence." *Lops*, 140 F.3d at 946. Rather, "to be settled, there must be *substantial* evidence of *significant* connections to the new environment." 323 F. Supp. 2d at 1313 (emphasis added). Ms. Garcia must therefore demonstrate, by a preponderance of the evidence, that Erika "is in fact settled in or connected to the new environment so that, at least inferentially, return would be disruptive with likely harmful effects." *In re Koc*, 181 F. Supp. 2d 136,

---

[21] Shortly after Ms. Garcia and Erika left Spain, Mr. Lima learned that they were in South Florida. There is insufficient evidence that Ms. Garcia concealed Erika's whereabouts from Mr. Lima, such that he did not know in what jurisdiction Erika was residing for purposes of filing a Hague petition. There was evidence and testimony that the Spanish central authority delayed ten months in sending Mr. Lima's request for Erika's return to the U.S. central authority, and also that Mr. Lima was unaware that he needed to file a petition in a U.S. court until July 2008—when his pro bono attorneys in the United States informed him of the law. Although the Court may consider "any relevant factor" in determining whether the one-year period should be equitably tolled, *see Van Driessche v. Ohio-Esezeoboh*, 466 F. Supp. 2d 828, 853 n.28 (S.D. Tex. 2006), and these facts do present a close case, the Court will not toll the one-year period here.

152 (E.D.N.Y. 2001) (internal quotation marks omitted). For the following reasons, the Court finds that Ms. Garcia has failed to meet this burden.

First, Erika is only three years old. Several courts have found that children of such tender years are too young "to allow meaningful connections to the new environment to evolve." *In re Robinson*, 983 F. Supp. 1339, 1345 (D. Colo. 1997); *see also Almaguer Arguelles v. Gaspar Vazquez (In re Hague Child Abduction Application)*, No. 08-2030-CM, 2008 WL 913325, at *11 (D. Kan. Mar. 17, 2008) ("[A]t her young age, [the six-year-old child] is adaptable."); *Belay v. Getachew*, 272 F. Supp. 2d 553, 561 (D. Md. 2003) (noting that a certain age may be required for a child to become settled and finding that at the age of nine a child was "now old enough to experience meaningful ties with the United States"); *David S. v. Zamira S.*, 574 N.Y.S.2d 429 (Fam. Ct. 1991) (finding that a three-year-old and a one-and-a-half-year-old child were not well settled).

Ms. Garcia testified that Erika is like other girls her age: she is happy, attends daycare, and spends her time with her half-sister and her aunt and uncle who reside in Hialeah. But Erika is not yet old enough to go to school, and she is too young to forge lasting and meaningful friendships with persons outside of her family. Ms. Garcia even testified that Erika "is the only little girl in the whole group." Tr. at 146:10–11. Ms. Garcia presented no evidence that Erika participates in any regular social, community, or extracurricular activities or that she attends church. Indeed, it is questionable whether a child of Erika's age has the developmental capacity to engage meaningfully in such activities and be considered settled due to them. *Cf. Zamira S.*, 574 N.Y.S.2d at 636 ("[A three-year-old and a one-and-a-half-year-old child] are not yet involved in school, extracurricular, community, religious or social activities which children of an older age would be.").

Second, Erika's residence has been unstable since she arrived in the United States in February 2007. The stability of a child's residence is an important factor in determining whether she is settled

in her new environment. *See Lopez v. Alcala*, 547 F. Supp. 2d 1255, 1260 (M.D. Fla. 2008) ("[S]ince they came to the United States they have moved around quite a bit."); *Mendez Lynch*, 220 F. Supp. 2d at 1363–64 (finding that a child who moved seven times in two years was not settled). Mr. Lima introduced an investigative report based on public records and commercially available sources demonstrating that Ms. Garcia and Erika have lived in at least five different residences during the eighteen months they have resided in South Florida. Ex. 37. Ms. Garcia did not contest this evidence; in fact, she testified to having "changed addresses." Tr. at 140:25. In *In re Ahumada Cabrera*, Judge Dimitrouleas concluded that a nine-year-old child was not well settled for the purposes of the Hague Convention in part because she had moved five times in two and a half years. 323 F. Supp. 2d at 1314–15. This Court concludes *a fortiori* that a three-year-old child who has moved five times in just *one* and a half years is not well settled.

Third, Erika has few relatives in her new environment. Ms. Garcia, her brother Enrique and his wife, and Erika's half-sister live in South Florida. Tr. at 145:19–146:11.  On the other hand, the rest of Erika's maternal and paternal family live in Spain or Cuba.  Her father resides in Spain, and she has a grandfather, aunt, and uncle, as well as a maternal grandmother there. Tr. at 47:10–13; 142:9–10. Ms. Garcia's father, half sister, and grandmother reside in Cuba. Tr. at 47:6-9.  On similar facts, courts have found children not to be well settled in the United States. *See, e.g.*, *In re Ahumada Cabrera*, 323 F. Supp. 2d at 1314 ("[O]ther than her mother and one aunt, the child has no support system in the United States."); *Giampaolo*, 390 F. Supp. 2d at 1282 (concluding that a ten-year-old child was not well settled, in part because although her mother, her uncle, and her uncle's family were in the United States, the rest of her family—maternal and paternal—was in Argentina); *Bocquet*, 225 F. Supp. 2d at 1349 (concluding that a five-year-old child was not well settled, in part because her maternal relatives lived in France and her paternal relatives lived in Algeria).

The Court has considered additional factors in finding that Erika is not well settled.  Despite a passing reference Ms. Garcia made to working, tr. at 144:19–20, she presented no evidence of the nature, length, or stability of any employment. *See Bocquet*, 225 F. Supp. 2d at 1349 (concluding that the child was not settled, in part, because the parent's employment history was not stable); *In re Koc*, 181 F. Supp. 2d at 154 (same).  Erika has attended two different daycare centers. *See In re Koc*, 181 F. Supp. 2d at 153.   Her mother and uncle appear to speak little English.[22]   *See In re Ahumada Cabrera*, 323 F. Supp. 2d at 1314 (fluency in English a factor).   These considerations also factor into the Court's finding that Erika is not settled in the United States.

Although Ms. Garcia testified that Erika has attained permanent-resident status in this country, tr. at 151:18, she presented no evidence of this.   In any case, this fact would not alone render Erika settled in the United States.   Although immigration status is a factor in deciding whether a child is well settled in her new environment, *see, e.g.*, *Giampaolo*, 390 F. Supp. 2d at 1282, alone it suggests little about "significant connections" that Erika may have established. *Cf. Mendez Lynch*, 220 F. Supp. 2d at 1364 (concluding that a child with U.S. and Argentine *citizenship* was not settled in the United States). Moreover, there is no guarantee that Erika will actually obtain U.S. citizenship if she remains here.

Erika is very young. She has lived in at least five different residences in only eighteen months. And she has more much family in Spain than in the United States.   For these and the additional considerations discussed above, the Court finds that the Ms. Garcia has not demonstrated, by a preponderance of the evidence, that Erika is well settled in the United States.

---

[22] Respondent's counsel represented to the Court that Mr. Garcia needed an interpreter, tr. at 96:11-12, and he testified through one.  Respondent herself and all witnesses she called also required an interpreter.

## C. There Is No Grave Risk That Erika's Return Would Expose Her to Physical or Psychological Harm.

Ms. Garcia's third defense is that ordering Erika's return to Spain would present "a grave risk that . . . her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b). There was absolutely no evidence whatsoever adduced at the final hearing that suggested any such risk of harm, much less a "grave" risk of harm, should Erika be returned to Spain. Significantly, ICARA requires that this defense be established by clear and convincing evidence. *See* 42 U.S.C. § 11603(e)(2)(A); *Mendez Lynch*, 220 F. Supp. 2d at 1364.

The U.S. Court of Appeals for the Sixth Circuit defined the serious type of harm that must be shown to satisfy this defense:

> First, there is a grave risk of harm when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute—*e.g.*, returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

*Friedrich*, 78 F.3d at 1069. The risk must be substantial. *See Mendez Lynch*, 220 F. Supp. 2d at 1364 ("This exception requires the alleged physical or psychological harm to be 'a great deal more than minimal'.") (quoting *Whallon v. Lynn*, 230 F.3d 450, 459 (1st Cir. 2000)).

Ms. Garcia argues that the grave-risk-of-harm defense applies for two reasons. She suggests that Erika would be placed in danger of serious abuse or neglect at the hands of Mr. Lima. In support, Ms. Garcia relies on Mr. Lima's October 2, 2006, conviction in a Spanish court for misdemeanor "unfair mistreatment," which resulted in a court order enjoining Mr. Lima from communicating, or entering into contact with, Ms. Garcia for four months. Exhs. 9-10. But that conviction was overturned on October 30, 2006, on the ground that Mr. Lima had been deprived of due process.

Exh. 10. And that incident, which occurred two years ago, concerned Ms. Garcia and her older daughter—not Erika.[23] For his part, Mr. Lima testified that Ms. Garcia had lied about the incident. Tr. at 22:3.

Ms. Garcia urges the Court to infer from this single incident that sending Erika back to Spain would place her in grave risk of serious abuse or neglect or in an intolerable situation, the threshold for the grave risk defense. This Court can make no such inference. No evidence suggests that Mr. Lima was ever physically or psychologically abusive toward Erika. In fact, Ms. Garcia testified that Mr. Lima was good to Erika, tr. at 124:19, and all the evidence corroborates this.  And even if there were such a risk, Ms. Garcia has failed to demonstrate that Spanish authorities are "incapable or unwilling" of giving Erika "adequate protection." *See Friedrich*, 78 F.3d at 1069. Quite to the contrary, Spanish authorities proved capable and willing to take action in response to Ms. Garcia's 2006 complaint.  The Court therefore finds that Ms. Garcia has failed to demonstrate at all, much less by clear and convincing evidence, that Erika would encounter a grave risk of harm of physical or psychological trauma if she were ordered to return to Spain with Mr. Lima.

Ms. Garcia also argues that Erika would suffer from psychological trauma if she were unmoored from her Hialeah residence and returned to Spain. This argument also fails. Courts have consistently held that the psychological harm to which the Hague Convention refers is above and beyond that which normally accompanies a child when she is returned to her removed-from country. *See, e.g.*, *Giampaolo*, 390 F. Supp. 2d at 1284–85; *Mendez Lynch*, 220 F. Supp. 2d at 1364 ("The harm must be greater than normally to be expected on taking a child away from one parent and

---

[23] Ms. Garcia alleged that Mr. Lima said to her older daughter that Ms. Garcia was "a bad woman" and "worthless," ex. 9, and that Ms. Garcia and her older daughter locked themselves in their bedroom after a verbal altercation. Ms. Garcia and her older daughter left the following day, and locked their bedroom door behind them. When they returned they found that Mr. Lima had tried to open the door forcefully—by banging on it and by trying to drill through the lock. Ex. 34.

passing the child to another parent. . . . Adjustment problems that would attend the relocation of most children is not sufficient.") (citing *Friedrich*, 78 F.3d at 1068). The Court is not unsympathetic to the fact that Erika may experience some negative effect if returned to Spain after having spent eighteen months in Miami. But the Court is constrained to apply this defense narrowly.  *See Boquet*, 225 F. Supp. 2d at 1347.  And there are important reasons not to find for Ms. Garcia on this ground.  "A removing parent must not be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which they were abducted." *Friedrich*, 78 F.3d at 1068; *see also Antunez-Fernandes v. Connors–Fernandes*, 259 F. Supp. 2d 800, 816 (N.D. Iowa 2003) ("[T]he grave harm exception . . . does not give the court in the abducted-to country a license to speculate on where the children would be happiest; that decision is a custody matter and is reserved to the court in the country of habitual residence."). The natural disruption that accompanies a child's return to the removed-from country is not the kind of psychological trauma to which Article 13(b) refers.  Accordingly, the Court concludes that this defense does not apply.

### D. Returning Erika to Spain Furthers the Interests of the Convention.

The Convention's objectives are to secure the prompt return of wrongfully removed or retained children in any contracting state and to ensure that one state's laws regarding custody rights are respected in the others. Convention, art. 1. To further those objectives, the signatories to the Convention gave to the courts of contracting states broad authority to carry them out. *See* Convention art. 18; *Baran v. Beaty*, 526 F.3d 1340, 1345 (11th Cir. 2008); *In re Ahumada Cabrera*, 323 F. Supp. 2d at 1310. In cases, therefore, where one or more of the defenses applies, Courts retain the discretion to return the child if it furthers the aims of the Convention. *See* Hague International Child Abduction Convention; Text and Analysis, 51 Fed. Reg. 10494, 10509 (Mar. 26, 1986) ("The courts retain the discretion to order the child returned even if they consider that one or more of the exceptions

applies."); *see also Giampaolo*, 390 F. Supp. 2d at 1285 (ordering return of the child even though respondent made out defense); *Barrera Casimiro v. Pineda Chavez*, No. Civ.A.1:06CV1889-ODE, 2006 WL 2938713, at *6 (N.D. Ga. 2006) (same); *Antunez-Fernandes*, 259 F. Supp. 2d at 815 (ordering return of two children even though they were "settled"); *Belay*, 272 F. Supp. 2d at 565 & n.8 (same).

The Court concludes that, even if Respondent had met her burden of proof on any of the defenses she asserted, returning Erika to Spain with Mr. Lima will directly further the aims of the Convention and ICARA.  There could hardly be a case where return of the child would more clearly effectuate the purposes of the Convention than this one. A Spanish custody proceeding is underway. A hearing to which the Spanish court summoned both Ms. Garcia and Mr. Lima is scheduled.  Exh. 27; DE 34.[24]  Ms. Garcia and Erika are Spanish citizens, and Mr. Lima is a permanent resident who is awaiting approval of his application for Spanish citizenship.  As recently as August 2008, Ms. Garcia traveled to Spain to become a citizen.  She swore her allegiance to that country and swore to obey its laws. While she was there, she was personally served with custody papers and an order to appear at the hearing. She was also ordered to surrender Erika's Spanish passport, an indication that Spanish authorities seek Erika's presence in Spain at the time a custody decision is made in order that it be effective. Moreover, Ms. Garcia represented that she has sought Spanish counsel for purposes of the hearing.  Tr. at 6:22-23; 154:5-7.  She also testified that she plans to appear at the custody hearing "if it is necessary." Tr. at 151:21-25.  This Court finds that it is necessary.

Spain and the United States are among over sixty signatories to the Hague Convention. All signatories agree that custody proceedings should proceed in the country where the child habitually resided at the date of wrongful removal, the country where custody disputes are best decided. *See*

---

[24] Originally set for October 9, 2008, the Spanish court has been moved the hearing to December 18, 2008, upon Mr. Lima's Spanish counsel's motion at the request of this Court.  Tr. at 203:21-204:2.

*Croll*, 229 F.3d at 137. Erika habitually resided in Spain when Ms. Garcia wrongfully removed her. A hearing regarding her custody is scheduled to take place within weeks.  Further, Spanish courts have ordered Ms. Garcia and implicitly Erika to be there for the hearing. It is in the interests of all signatories to ensure the effective resolution of custody disputes. For this reason, the Court will return Erika to Spain with Mr. Lima to be present for the December 18, 2008, custody proceeding.[25]

## VI. Recommendation

Because Erika was wrongfully removed from Spain, her pre-removal habitual place of residence, and because Respondent has proven none of the defenses to return under the Hague Convention or ICARA, it is hereby respectfully **RECOMMENDED** that the Court:

1. GRANT the Verified Petition for Return of Minor Child to the Kingdom of Spain filed by Erich Humberto LIMA Moreno [DE 1];

2. ORDER that Erika LIMA Garcia return to Spain in the custody of Mr. Lima no later than ten (10) days from the entry of an Order so directing;

3. ORDER that Erika LIMA Garcia remain in the physical custody of Mr. Lima until the time of their departure for Spain;

4. ORDER that the passport of Erika LIMA Garcia remain in the custody of the Court until such time as Mr. Lima provides evidence that he has obtained an airline ticket to Spain for himself and Erika, at which time the child's passport shall be released to him or his attorneys for delivery to him;

---

[25] The Spanish court is fully capable of addressing any complaint Ms. Garcia has about property rights she may inadvertently have given up, may grant her custody rights, and may even permit her to return with Erika to live in the United States.  *See, e.g., Belay* 272 F. Supp. 2d at 565 n.8 (noting that foreign court might permit permanent relocation to the U.S.). This Court has no jurisdiction to decide with which parent, or in which country, Erika will live; its mandate is simply to restore the status quo before Ms. Garcia wrongfully removed Erika from Spain. *See, e.g.*, *Bocquet*, 225 F. Supp. 2d at 1340.

5. ORDER that the United States Marshals Service ensure that Mr. Lima is able to comply with any Order issued and accompany Mr. Lima and Erika to the Miami International Airport, and that all other federal, state, and local law enforcement officers be notified that Mr. Lima has the authority and the lawful temporary custody to remove Erika from the United States of America and return with her to Spain, *see Bocquet*, 225 F. Supp. 2d at 1353; and

6. ORDER that Mr. Lima, upon his return to Spain, continue to submit to the Spanish court with jurisdiction over the pending custody proceedings for resolution of custody, visitation, and related issues.

This recommendation is not, of course, a determination of the merits of any custody issues within the meaning of Article 19 of the Convention.   As indicated above, those are left to the appropriate Spanish court.

In keeping with the expedited nature of Hague Convention proceedings generally, Convention, art. 2 and 11, and because of the specific circumstances of this case[26], the Court will exercise its discretion to shorten the normally applicable 10-day period to file objections to a U.S. Magistrate Judge's Report and Recommendation where exigent circumstances exist.   *See, e.g., Hispanic Counseling Center v. Village of Hempstead*, 237 F. Supp. 2d 284, 289-90 (E.D.N.Y. 2002) (ten-day objection period "may be shortened where emergencies exist"; upheld 5 days to file objections); *Cuviello v. City of Oakland*, No. C 06-05517, 2007 WL 2349325 (N.D. Cal. Aug. 15, 2007) (shortening period to one day where injunction was at issue); *Tripati v. Drake*, No. 89-55330, 1990 WL 100242, at *1 (9th Cir. July 19, 1990) (three days).  **The parties have five (5) days from the date of this Report and Recommendation to file written objections**, if any, for consideration by the Honorable Joan A. Lenard, United States District Judge.  The party

---

[26] Mr. Lima is using limited, accumulated vacation time to participate in this proceeding and has already been in the United States for nearly four weeks.  Tr. at 52:17-24; 205:2-8.

opposing the objections shall have two (2) days to respond to any objections.   Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein. Fed. R. Civ. P. 72.  *See also LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir. 1988).

RESPECTFULLY SUBMITTED this 10th day of October, 2008.

BARRY L. GARBER
UNITED STATES MAGISTRATE JUDGE